IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION<br>800 K Street N.W., Suite 1000<br>Washington, D.C. 20001,<br><br>    Plaintiff,<br><br>  v.<br><br>DONALD J. TRUMP<br>President of the United States<br>1600 Pennsylvania Avenue N.W.<br>Washington, D.C. 20500,<br><br>SCOTT KUPOR<br>Director<br>Office of Personnel Management<br>1900 E Street N.W.<br>Washington, D.C. 20415, and<br><br>COKE MORGAN STEWART<br>Acting Director, Patent and Trademark Office<br>Mail Stop 8, P.O. Box 1450<br>Alexandria, VA 22313-1450,<br><br>    Defendants. | Case No. 1:25-cv-2990<br><br>COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

  1. Plaintiff National Treasury Employees Union (NTEU) is a labor union that represents federal government employees in thirty-seven agencies and departments. NTEU negotiates collective-bargaining agreements with agency employers, pushes for legislation that improves federal employees' working lives, and litigates disputes involving federal employees' rights.

1

2. NTEU's advocacy for federal workers—and against this Administration's anti-worker policies—has led to the President retaliating against NTEU in an unprecedented way: by issuing executive orders stripping NTEU-represented workers of their statutory rights to collectively bargain.

3. The first executive order stripping NTEU-represented workers of their statutory collective-bargaining rights, Executive Order No. 14,251, *Exclusions from the Federal Labor-Management Relations Program* (the Exclusions Order), issued on March 27, 2025. It exempted a dozen federal agencies or departments in which NTEU represents bargaining unit employees from the Federal Service Labor-Management Relations Statute (the Statute) in whole or in part. These exemptions eliminated the collective-bargaining rights of about two-thirds of the nearly 160,000 federal workers whom NTEU represents.

4. In all, the Exclusions Order eliminated the collective-bargaining rights of approximately two-thirds of the entire federal workforce. And it indicated that more would come: It required, at Section 7, agency heads to submit reports to the President with any additional agencies that should be exempted.

5. The second executive order nullifying the statutory collective-bargaining rights of NTEU-represented workers, Executive Order No. 14,343, *Further Exclusions from the Federal Labor-Management Relations Program* (the Further Exclusions Order), issued on August 28, 2025. The Further Exclusions Order exempts additional agencies from the Statute, including the Office of the Commissioner for Patents (the Patents Office), a component of the U.S. Patent and

Trademark Office (PTO). *Id.* sec. 2(b). NTEU represents bargaining unit employees in the Patents Office.

6. The President's executive orders rely on very narrow authority that Congress gave to the President to exclude certain agencies from the Statute. This authority applies if the agency "has a primary function of intelligence, counterintelligence, investigative, or national security work," and if the Statute cannot be applied to the agency "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

7. With respect to the Exclusions Order, the President's exemptions were retaliatory and not based on the statutory criteria. The Administration's own issuances show that the President's exclusions were not based on national security concerns, but instead a policy objective of making federal employees easier to fire and political animus against federal sector unions. The exemptions thus "reflect President Trump's frustration with the unions' representational activity and exercise of their First Amendment rights . . . and the impact those activities have had on his policy directives." *NTEU v. Trump*, 780 F. Supp. 3d 237, 256 (D.D.C. 2025), *stayed on other grounds*, 2025 U.S. App. LEXIS 11952 (D.C. Cir. May 16, 2025).

8. The same is true for the Further Exclusions Order that is the focus of this complaint. As the name makes clear, the more recent order—entitled "*Further Exclusions*"—is a mere extension of the earlier Order. The Further Exclusions Order is therefore unlawful and must be enjoined.

## JURISDICTION

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

10. Venue is proper in the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e). NTEU is headquartered in Washington, D.C. And a substantial part of the events giving rise to NTEU's claims occurred in Washington, D.C., because the Further Extensions Order was issued there.

## PARTIES

11. Plaintiff NTEU is an unincorporated association with its principal place of business at 800 K Street N.W., Suite 1000, Washington, D.C. 20001. NTEU is, pursuant to Title VII of the Civil Service Reform Act, Public Law No. 95-454, 92 Stat. 1111, the exclusive bargaining representative of nearly 160,000 federal employees in thirty-seven departments and agencies. NTEU represents the interests of these employees by enforcing employees' collective and individual rights through grievances and federal court litigation; negotiating collective-bargaining agreements; filing unfair labor practice charges; and advocating in Congress for favorable working conditions, pay, and benefits. NTEU brings this action on behalf of itself because the Further Extensions Order harms it directly.

12. Defendant Donald J. Trump is the President of the United States of America. On August 28, 2025, he issued the Further Exclusions Order, which exempts additional federal agencies from the Statute.

13. Defendant Scott Kupor, in his official capacity as the Director of the

Office of Personnel Management (OPM), will implement and guide federal agencies' compliance and implementation of the Further Exclusions Order.

14. Defendant Coke Morgan Stewart, in her official capacity as the Acting Director of PTO, will comply with the Further Exclusions Order and will take steps to implement it as described in this complaint—for example, by refusing to recognize and engage with NTEU as the duly elected representative of bargaining unit employees in the Patents Office.

## STATEMENT OF CLAIMS

### I. Congress Broadly Granted Collective-Bargaining Rights to Federal Employees.

15. "In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the [prior] regime." *Bureau of Alcohol, Tobacco, & Firearms v. Fed. Labor Rel. Auth.*, 464 U.S. 89, 107 (1983). Thus, as Title VII of the Act, Congress enacted the Statute, 5 U.S.C. § 7101 *et seq.*

16. Congress intended the Statute to replace the then-existing Executive-Order regime governing federal labor relations with a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).

17. The Statute rests on Congress's explicit finding that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . .

5

safeguards the public interest." 5 U.S.C. § 7101(a)(1).

18. Through the Statute, Congress assigned federal sector labor organizations the job of "act[ing] for" and "negotiat[ing] collective bargaining agreements covering" not only their members, but all employees in the bargaining units that they were elected to represent. 5 U.S.C. § 7114(a).

19. Congress gave federal sector labor unions this responsibility based upon its conclusion that the work of labor organizations "contributes to the effective conduct of public business" and "facilitates and encourages the amicable settlement of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1).

20. The Statute generally requires bargaining over matters affecting conditions of employment. *See* 5 U.S.C. § 7103(a)(14). It also requires agencies to honor the requests of their employees who wish to voluntarily join a federal sector union and to have dues deducted from their paychecks. 5 U.S.C. § 7115.

21. Congress specifically excluded some agencies or offices within agencies from the Statute, such as the Federal Bureau of Investigation. 5 U.S.C. § 7103(a)(3).

22. The Statute gives the President narrow grounds to exclude additional agencies if he determines that an agency or subdivision has a "primary function of intelligence, counterintelligence, investigative, or national security work," *and* the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added).

## II. The President's Exclusion of the Patents Office from the Statute is Unlawful.

23. Presidents have issued orders exempting certain offices from the Statute. But before the Exclusions Order, no President had ever exempted an entire Cabinet-level agency—let alone multiple Cabinet-level agencies.

24. President Trump's Exclusions Order stripped collecting-bargaining rights from three-quarters of the federal employees who are currently represented by federal sector unions. *See* Hassan Ali Kanu, Trump Moves to Strip Unionization Rights from Most Federal Workers, Politico.com (Mar. 28, 2025), www.politico.com/news/ 2025/03/28/union-rights-federal-workers-donald-trump-00257010. It eliminated collective bargaining for some two-thirds of the federal workforce. *Id.*

25. The exempted agencies "are no longer subject to the collective bargaining requirements of chapter 71," and the unions representing bargaining unit employees at those agencies have "los[t] their status" as the exclusive representatives for those employees. *See* OPM, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* (Mar. 27, 2025) at 3, www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf (OPM Guidance). Thus, the OPM Guidance discussed the "terminat[ion] of [] CBAs" at these agencies in the context of ending participation in negotiated grievance procedures and ending compliance with negotiated reduction-in-force articles. *Id.* at 5.

7

26. NTEU represents a dozen federal departments or agencies that the Exclusions Order excluded from the Statute's coverage in whole or in part. Eleven agencies were exempted entirely: the Internal Revenue Service, IRS Office of Chief Counsel, Federal Communications Commission, Department of Energy, Bureau of Fiscal Service, Environmental Protection Agency, Treasury's Departmental Offices, Office of the Comptroller of the Currency, Alcohol and Tobacco Tax and Trade Bureau, Bureau of Land Management, and the Department of Justice. NTEU represents five components of the Department of Health and Human Services (HHS) that the Executive Order exempted, while other NTEU-represented parts of HHS remain within the Statute's coverage.

27. The Exclusions Order led to twelve collective-bargaining agreements that NTEU bargained with those departments and agencies not being honored. And it has caused NTEU to lose approximately two-thirds of the bargaining-unit employees that it represents. NTEU has represented several of the bargaining units that the Exclusions Order excluded from the Statute's coverage for decades and some since the Statute's inception.

28. A federal district court preliminarily enjoined the Exclusions Order's exemptions that NTEU challenged because it found "clear evidence that 'the President was indifferent to the purposes and requirements of the [Statute], or acted deliberately in contravention of them.'" *NTEU v. Trump*, 780 F. Supp. 3d at 254. The evidence showed that the exemptions were prompted by "a retaliatory motive to punish unions for the 'war' they have 'declared [] on President Trump's

agenda" and a desire to "make federal employees easier to fire"—as opposed to Section 7103(b)(1)'s narrow criteria. *Id.* at 256-57.

29.     Those same deficiencies infect the Further Exclusion Order's exemption of the Patents Office from the Statute. The exemption is in furtherance of the very same improper objectives as the Exclusions Order.

### III.     The Patents Office Does Not Plausibly Fit Section 7103(b)(1)'s Narrow Criteria for Exclusion from the Statute.

30.     The Patents Office does not primarily perform intelligence, counterintelligence, investigative, or national security work. Employees in the Patents Office primarily examine applications for patents on inventions and record patents.

31.     In a White House Fact Sheet, the President provides his justification for exempting the Patents Office from the Statute. But the one function on which the President bases his exemption is misstated. And it would not be a "primary" function of the Patents Office, in any event.

32.     Here is the President's justification for exempting the Patents Office, as stated in the Fact Sheet accompanying the Further Exclusions Order:

> The Invention Secrecy Act tasks the PTO with reviewing inventions made in the United States, assessing whether their release could harm national security, and if so, issuing secrecy orders that prevent public disclosure. Effectively performing this work is essential to ensuring U.S. inventions with military or other national security applications do not fall into enemy hands.

33.     The Patents Office does not, however, assess whether the release of patent applications could harm national security. Under the Invention Security Act,

9

35 U.S.C. § 181, patent applications whose release might be detrimental to national security are referred to the Atomic Energy Commission, the Secretary of Defense, or other defense agencies that make the determination whether the publication or disclosure of the invention could harm national security.

34.  The Patents Office does not, therefore, assess whether releasing certain patent applications could have national security implications. And even as to the initial screening, that is not a primary function of the Patents Office (or PTO, for that matter). The screening of the patent applications for referral to the defense agencies is an ancillary duty of roughly two dozen of the nearly 9,000 patent examiners at PTO.

35.  NTEU has represented bargaining unit workers at the Patents Office since 1985. For four decades, the Patents Office has fallen within the Statute's coverage and had a collective-bargaining agreement with NTEU without any adverse effect on national security interests.

### IV.  The Actual Reasons for the President's Exclusion of the PTO Patents Office Have Nothing to Do with National Security.

36.  The OPM Guidance on the Exclusions Order showed that the President's primary motivation for excluding agencies from the Statute's coverage was to make their employees easier to fire.

37.  The first section of the OPM Guidance bore the heading "Performance Accountability" and was aimed at "facilitat[ing] the separation of underperforming employees." OPM Guidance at 3. That section stated, "[a]gency CBAs often create

procedural impediments to separating poor performers beyond those required by statute or regulation." *Id.*

38. Indeed, the OPM Guidance referenced the larger context: the President's direction to agencies "to prepare large-scale reductions in force (RIFs)." OPM Guidance at 5. After exclusion from the Statute, OPM advised that agencies could "conduct RIFs . . . without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.*

39. The White House Fact Sheet on the Exclusions Order revealed the secondary motivation for the exemptions: political retribution. In justifying the Exclusions Order, the Fact Sheet stated that "[c]ertain Federal unions have declared war on President Trump's agenda."

40. NTEU is one of the federal unions that has fought back against President Trump's agenda. It has filed several lawsuits and dozens of grievances in response to the Trump Administration's actions against federal workers.

41. This context from the Exclusions Order is critical to viewing the Further Exclusions Order. The same unrelated policy goal—firing federal employees with more ease—and the same animus against unions that have challenged the Administration's policies are motivating the President's additional exclusions.

42. The Further Exclusions Order's exemption of the Patents Office is further retaliation for NTEU's protected activity—namely, its litigation against this Administration.

11

## V. The Further Exclusions Order Will Cause NTEU Immediate Harm to Its Bargaining Power and Influence with the Patents Office.

43. The Further Exclusions Order reduces the number of employees that NTEU represents at the Patents Office. This will severely diminish NTEU's influence at the bargaining table and in the workplace at the Patents Office.

44. The strength and influence of any union correlate directly with the size of its membership. Because the Further Exclusions Order will reduce the number of employees that NTEU represents at the Patents Office, NTEU's influence in negotiating agreements with the Patents Office will be diminished.

45. NTEU will also lose opportunities to advocate for these workers, including at a time when federal workers are under unprecedented attack. These opportunities, once gone, are lost forever.

46. The Further Exclusions Order will prevent NTEU from collecting dues from its members at the Patents Office. NTEU gets 94% of its dues revenue through its members' payroll deductions. The OPM Guidance directed agencies that were excluded from the Statute through the Executive Order to stop using payroll deductions for dues payments to unions. This will stop the flow of nearly all of the dues revenue from NTEU members at the Patents Office who are exempted from the Statute through the Further Exclusions Order. NTEU will also lose the interest it would otherwise earn on that revenue in its accounts.

## CAUSES OF ACTION

**Count 1:   The President's Further Exclusions Order, Section 2(b), is unlawful and *ultra vires* because it conflicts with 5 U.S.C. § 7103(b)(1).**

47.   NTEU reasserts the allegations contained in paragraphs 1 through 46 of this complaint as though contained herein.

48.   Courts have jurisdiction to grant relief when the President acts beyond the scope of his authority and violates the law, to the injury of an individual or organization.

49.   A President can exclude an agency from the Statute *only* if the agency has "as a primary function intelligence, counterintelligence, investigative, or national security work" *and* if the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

50.   The Patents Office does not plausibly meet the requirements of 5 U.S.C. § 7103(b)(1). It therefore cannot be excluded from the Statute using this narrow exception.

51.   The Patents Office's exclusion from the Statute was not based on Section 7103(b)(1)'s criteria. It was instead based on a policy goal of making federal employees easier to fire and political animus against federal sector unions who have opposed the Trump Administration's initiatives. These considerations are an improper basis for exclusions under Section 7103(b)(1).

**Count 2:   The President's Further Exclusions Order, Section 2(b), is unlawful and *ultra vires* because it conflicts with 5 U.S.C. §§ 7101, 7103(b)(1).**

52. NTEU reasserts the allegations contained in paragraphs 1 through 51 of this complaint as though contained herein.

53. Courts have jurisdiction to grant relief when the President acts beyond the scope of his authority and violates the law, to the injury of an individual or organization.

54. The Exclusions Order exempted about two-thirds of the federal workforce and three-fourths of workers who are currently represented by unions from the Statute. The Further Exclusions Order further winnows the number of federal employees who may take part in Congress's collective-bargaining regime.

55. The President's attempt to largely nullify the Statute through the Statute's national security exemption conflicts with Congress's intent in enacting the Statute.

56. Congress enacted the Statute to facilitate and to strengthen collective bargaining in the federal sector (*Bureau of Alcohol, Tobacco, & Firearms*, 464 U.S. at 107), codifying its finding that collective bargaining is in the public interest in the Statute's initial section (5 U.S.C. § 7101(a)).

57. Congress's aim with the Statute was to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).

14

58. The President cannot use the Statute's narrow national security exemption to undo the bulk of the Statute's coverage. His additional exclusions through his Further Exclusions Order thus conflict with the Statute.

**Count 3: The President's Further Exclusions Order, Section 2(b) is unlawful because it reflects retaliation in violation of NTEU's First Amendment rights.**

59. Plaintiff reasserts the allegations contained in paragraphs 1 through 58 of this complaint as though contained herein.

60. "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).

61. NTEU's litigation against the Trump Administration's actions is protected speech and petitioning activity. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-49 (2000) (holding that "advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection); *McDonald v. Smith*, 472 U.S. 479, 484 (1985) (holding that "filing a complaint in court is a form of petitioning activity" that the First Amendment protects).

62. The Exclusions Order retaliated against NTEU for that protected First Amendment activity. The White House's Fact Sheet on the Executive Order proclaimed the Order's retaliatory motive. It stated that "[c]ertain Federal unions have declared war on President Trump's agenda." This statement and others in the Fact Sheet "appear[ed] to be in direct response to the number of lawsuits and grievances NTEU has filed against the Trump Administration in the last several

15

months." *NTEU v. Trump*, 780 F. Supp. 3d at 256. The Exclusions Order thus punished NTEU for its legal challenges to this Administration's actions, eliminating NTEU's ability to serve as the exclusive bargaining representative for about two-thirds of its membership.

63. The Further Exclusions Order continues the President's retribution against NTEU. NTEU continued to engage in protected activity, such as federal court litigation and the filing of grievances, against the Administration after the Exclusions Order. The President then took aim at yet another of NTEU's bargaining units, the Patents Office, and has excluded it from the Statute.

64. The Further Exclusions Order (like the Exclusions Order) thus "constitutes a sufficiently adverse action" against NTEU "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Order, in other words, "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff NTEU requests judgment against all Defendants other than President Trump:

A. Declaring that Section 2(b) of the Further Exclusions Order is unlawful as applied to NTEU.

B. Enjoining implementation of Section 2(b) of the Further Exclusions Order as to NTEU.

C. Awarding Plaintiffs reasonable attorney fees and costs incurred.

D.  Ordering such further relief as the Court may deem appropriate.

`                               Respectfully submitted,

 */s/  Julie M. Wilson*
JULIE M. WILSON
General Counsel
D.C. Bar 482946

 */s/  Paras N. Shah*
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881

 */s/  Allison C. Giles*
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705

 */s/  Jessica Horne*
JESSICA HORNE
 Assistant Counsel
 D.C. Bar 1029732

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org

September 3, 2025          Attorneys for Plaintiff NTEU